**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

WILLIAM VANDEN HOLLOWAY,

        Plaintiff,

v.                                            ACTION NO. 4:11cv35

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia on cross-motions for Summary Judgment. This Court recommends that the decision of the Commissioner be AFFIRMED.

### I. PROCEDURAL BACKGROUND

Plaintiff William Vaden Holloway filed an application for Disability Insurance Benefits

on March 20, 2008 (R. 81-90),[1] alleging disability since December 31, 2005, due to heart disease, emphysema, copd, depression, mini strokes and migraines. R. 83, 110. The Social Security Administration denied Plaintiff's application initially (R. 63) and on reconsideration (R. 64). Plaintiff requested and received an administrative hearing on December 30, 2009 before ALJ Irving A. Pianin. R. 24-53. The ALJ issued a decision denying Plaintiff's claim on January 7, 2010. R. 14-23. On December 2, 2010, the Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. R. 1-6. Plaintiff timely filed the instant action for judicial review by this Court, pursuant to 42 U.S.C. § 405(g). ECF No. 1. The case is ripe for resolution of the parties' cross-motions for summary judgment. ECF Nos. 10 & 14.

## II. FACTUAL BACKGROUND

### A. Medical Evidence in the Record

In March 2007, Plaintiff presented to Charles Vaughan, M.D., for a cardiac evaluation prior to foot surgery to remove a cyst. R. 419.[2] A cardiolite stress test revealed cardiac abnormalities, an ischemic inferior apical defect. R. 417, 489. One month later, in April 2007, Plaintiff underwent a heart catheterization with coronary left ventricular angiography. R. 217. The catheterization revealed severe single vessel right coronary artery disease with moderate diffuse disease in the mid portion of the circumflex coronary artery and diffuse disease in the left anterior descending. R. 489. After reviewing these diagnostic tests, Dr. Vaughan recommended medical therapy for symptomatic relief. R. 217-18. At a follow-up evaluation, Plaintiff denied

---

[1] Page citations are to the administrative record (ECF No. 5).
[2] The record includes evidence from two surgeries. In May 2008, Plaintiff has a cyst removed from the bottom of his foot, R. 293, and in August 2009, Plaintiff had a cyst removed from his left groin. R. 429. Both surgeries were successful in that they resolved any pain/symptoms caused by the cysts. R. 48

2

experiencing shortness of breath, dizziness, or syncope. R. 415. He alleged having chest heaviness which lasted for "seconds." R. 415. Smoking cessation was discussed. R. 490 Plaintiff admitted that he never filled the prescription for Norvasc given to him at his discharge from the hospital, and a nurse practitioner at Dr. Vaughan's office directed him to begin taking that medication. R. 415-16.

At a follow-up visit in August 2007, Plaintiff told Dr. Vaughan that he experienced dyspnea (shortness of breath) from time to time "if he over-exerts himself" and that he only "occasionally" felt heaviness in his chest. R. 412. Pulmonary function studies revealed a "mild" obstructive defect and an echocardiogram showed normal wall motion with moderate aortic insufficiency, no aortic stenosis, a sclerotic but anatomically tricuspid value, mild mitral regurgitation, and normal right heart pressure. R. 412. A carotid study revealed "mild" carotid stenosis. R. 412. Dr. Vaughan noted that Plaintiff complained of a limited capacity for exercise, but the doctor opined that Plaintiff's symptoms were pulmonary rather than cardiac in nature. R. 412.

Daniel Menees, M.D., evaluated Plaintiff in August 2007 to provide a second opinion concerning Plaintiff's diagnosis of coronary artery disease. R. 264-68. On examination, Plaintiff's heart had a regular rate and rhythm and he appeared in no acute distress. R. 267. An electrocardiography (EKG) revealed normal sinus rhythm with a right bundle branch block. R. 267. Dr. Menees opined that Plaintiff was on an excellent medical regimen. R. 268. The doctor also opined that "[g]iven [Plaintiff's] overall lack of angina and symptoms as well as the fact that he is well collateralized via three separate and distinct collaterals, I do not favor

percutaneous revascularization for this lesion." R. 264.[3] Dr. Menees ultimately determined that Plaintiff should continue medical therapy and stop smoking. R. 264.

In November 2007, Plaintiff returned to Dr. Vaughan and reported feeling tired but denied having shortness of breath, syncope (or near syncope), palpitations, or peripheral edema. R. 407. Dr. Vaughan determined that Plaintiff should continue with medication management and need not return for a year. R. 407.

In December 2007, Plaintiff presented to Rajinder P. Singh, M.D., a neurologist, for evaluation of headaches, which began 8 to 9 months earlier. R. 291-92. Dr. Singh ordered a magnetic resonance imaging (MRI) and magnetic resonance angiography (MRA) of the brain, R. 292, which were both normal, R. 284. Neurological evaluations were also normal. R. 281-84. Dr. Singh opined that Plaintiff's headaches were vascular, and prescribed Neurontin and Fioricet. R. 284. Plaintiff later reported that his headaches significantly subsided since he began taking Neurontin and he denied experiencing double vision, dizziness, difficulty talking, difficulty swallowing, numbness or weakness of the extremities. R. 281-83. Plaintiff also reported to Dr. Singh, in June of 2008, that "the medication [wa]s working" without untoward side effects. R. 281. Dr. Singh opined that Plaintiff was "doing well." R. 281.

Plaintiff returned to Dr. Vaughan in October 2008. R. 406. From a cardiac standpoint, Dr. Vaughan noted that Plaintiff took a long-acting nitrate and "has had no further chest discomfort" and has been "staying relatively active without any problems." R. 406. Plaintiff again denied

---

[3] Coronary revascularization is the process of restoring the flow of blood to the heart by removing or bypassing blockages in the coronary arteries. The word percutaneous means the procedure is performed through the skin (through a catheter), rather than through an open surgical procedure. *See* http://med.stanford.edu/stanfordhospital/clinicsmedServices/COE/heart/DiseasesConditions/coronaryArteryDisease/percutaneousCoronaryRevascularization.html (last visited December 14, 2011).

4

shortness of breath, syncope, or peripheral edema. R. 406.[4] Dr. Vaughan ordered a stress echocardiogram during which Plaintiff only achieved 54% of his age predicated maximum heart rate; however, no evidence of ischemia or infarction existed during the examination. R. 405-06. Dr. Vaughan urged Plaintiff to stop smoking and to start a regular exercise program. R. 405. The doctor opined that Plaintiff's symptoms were related to reconditioning as he lived a very sedentary lifestyle. R. 405. He also opined that Plaintiff need not return to the office for a year. R. 405.

In February 2009, Plaintiff visited his primary care physician, Roland Bercasio, M.D., to undergo an x-ray of his lumbar spine which showed "mild" degenerative changes that were stable since the last study. R. 337, 474. Dr. Bercasio further noted that lumbar alignment and SI joints were both normal, and vertebral body heights and disk spaces were maintained. R. 474.

In March 2009, Plaintiff presented to Robert Campolattaro, M.D. for an evaluation of left wrist pain. R. 425. Dr. Campolattaro's report states than an x-ray of Plaintiff's left wrist showed no focal degenerative changes, osteolysis, or soft tissue calcification. R. 425. Dr. Campolattaro injected Plaintiff's wrist with a corticosteroid and advised him to follow up as needed. R. 425.

In August 2009, Plaintiff reported to Dr. Bercasio, complaining of groin pain. R. 494. Though Dr. Bercasio indicated Plaintiff had lost weight and appeared thin, the rest of the physical report exam indicated normal results, including those of his chest and cardiovascular exam. Id.

Plaintiff visited Wendell Poulsen, M.D. in October 2009 for migraine headaches. R. 506. Unable to afford the medication prescribed by Dr. Poulsen for the migraines, Plaintiff was

---

[4] Plaintiff reported one episode of loss of consciousness but was not sure if he tripped and fell or had actually blacked out. R. 406. In any event, Plaintiff denied experiencing other similar episodes. R. 406.

treated at the office with Pheneragan and Demerol injections. Id.

Also in October 2009, Plaintiff returned to Dr. Singh for evaluation of his headaches for which the doctor prescribed Depakote. R. 478. Plaintiff returned to Dr. Singh's office in December 2009 and reported that the medication worked well, but he had difficulty having the medication filled because the Veteran's Administration Medical Center did not carry that medication. R. 478. Dr. Singh gave Plaintiff samples for Depakote and advised him to return to the office for a follow-up examination in a month. R. 478.

In April 2010, Plaintiff visited Dr. Bercasio for a follow-up appointment regarding "multiple medical problems," including chronic angina, headaches, and chronic obstructive pulmonary disease (COPD). R. 526. Dr. Bercasio indicated that Plaintiff continued to smoke a pack of cigarettes daily and counseled Plaintiff on smoking cessation. R. 527. The results of Plaintiff's physical exam report were all normal. R. 528. Dr. Bercasio further indicated that Plaintiff's various symptoms were greatly relieved with the use of Plaintiff's prescribed medications. Id.

The record contains two state agency physician opinions. In May 2008, Robert Castle, M.D., a state agency physician, reviewed the medical evidence of record, including Plaintiff's subjective complaints, and determined that Plaintiff retained the ability to perform sedentary work activities. R. 273-79. Specifically, Dr. Castle opined that Plaintiff could occasionally lift up to 10 pounds; frequently lift less than 10 pounds; stand and walk for at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally perform postural activities; but needed to avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation; and other environmental pollutants. R. 274-76. In September 2008, Leopold Moreno, M.D., reviewed

6

the updated record, including Plaintiff's subjective complaints, and agreed with Dr. Castle's functional assessment. R. 392-98.

The administrative record also contains an award letter from the Department of Veterans Affairs (VA). R. 205-10. On April 13, 2010, the VA issued a decision finding that Plaintiff was partially disabled, and entitled to VA benefits under its rules. R. 205-06.

Finally, although Plaintiff reported using a cane, it was not prescribed by a doctor. R. 141, 164.

### B. Plaintiff's Statement and Hearing Testimony

At his administrative hearing held December 30, 2009, Plaintiff testified that he last worked in December of 2005, R. 30, when he retired from his position as a security manager with the Federal government at age 55, R. 125. Plaintiff amended his alleged onset date of disability to April 10, 2007. R. 27.

Plaintiff alleged that he could lift 3-4 pounds, sit for "a few minutes" at a time before his lower back begins hurting, walk 400 feet at a time, and had difficulty standing. R. 34-35. He also had migraine headaches several times a month that he would rate a "10" in severity, and daily migraine headaches between 0 and 5 in severity. R. 37. He had difficulty picking up items with his hands, R. 41, and his legs and knees ache with standing, R. 35, 36.

Finally, Plaintiff alleged fatigue. R. 44. He described getting out of breath and experiencing chest pain when he walked to the mailbox. R. 44. He bathes every 2 to 3 days, and is breathless after showering. R. 51. He had difficulty dressing, and spends half to three-quarters of the day in his Lay-z-boy. R. 51.

Plaintiff acknowledged performing "general housework," running his clothes through the

washing machine, and driving when necessary. R. 36. He had to rest after light cleaning for 20 minutes, R. 45, which included scrubbing the bathroom, R. 46.

Linda Augins, a vocational expert, testified that Plaintiff's past relevant work as a security manager is generally skilled work performed at the sedentary level. R. 51-52. She added that Plaintiff described a medium component to his work. R. 52. Ms. Augins also testified that Plaintiff could return to work as a security manager, as that occupation is generally performed, if he were limited to, "sedentary work, provided the work does not involve more than two hours of standing and walking in an eight hour workday, would not require more than occasional postural activities, and would not expose the individual to any excessive dusts, fumes, odors or gasses." R. 52. Ms. Augins further testified that if Plaintiff's testimony regarding his physical limitations is credible, he would not be able to perform any job in the national economy on a sustained full-time basis. R. 52.

**C. The ALJ's Decision**

At step one of the sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. R. 19.

In evaluating the claims at step two and step three of the sequential evaluation process, the ALJ found that Plaintiff had a cardiac disorder, hypertension, chronic obstructive pulmonary disorder, vascular headaches, and a back disorder that were severe under the regulations (at step two), but not enough to meet or equal in severity any of the Listing of Impairments (step three). R. 19-20.

Prior to moving to step four, the ALJ evaluated the evidence of record and determined that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20

8

C.F.R. § 404.1567(a) except that the claimant can stand or walk for only 2 hours in an 8-hour workday. R. 20. The ALJ further determined that Plaintiff could only occasionally perform postural activities and needed to avoid excessive exposure to environmental conditions such as dusts, fumes, odors, or gases. R. 21. The ALJ determined that Plaintiff's impairments could reasonably cause the type of pain alleged, but that Plaintiff's testimony overstated the intensity and persistence of his pain and was not entirely credible. R. 21.

The ALJ observed that Plaintiff's headaches responded well to medication. R. 22. Also, the ALJ observed that Plaintiff's hypertension was controlled by medication. R. 22. The ALJ further noted that Plaintiff's pain has been well-managed with medication. R. 22. The ALJ noted that an x-ray of Plaintiff's lumbar spine revealed only mild degenerative changes, R. 22, and that he had normal range of motion in his back, R. 22. The ALJ also observed that Plaintiff has not required hospitalizations or emergency room visits for any severe impairment since 2007, demonstrating that his impairments are treated conservatively and are manageable with medication. R. 22. The ALJ considered Plaintiff's activities and determined that they supported the ability to perform some work activities. R. 22. The ALJ observed that Plaintiff could perform light housework, prepare meals, do laundry, and drive a car. R. 22. Further, the ALJ observed that no treating physician provided an opinion indicating that Plaintiff is disabled. R. 22. The ALJ considered that two state agency physicians agreed that Plaintiff could perform sedentary work activities. R. 22.

At step four, the ALJ found that Plaintiff was capable of performing his past relevant work as a security manager. R. 23. The ALJ based his finding on the vocational expert's testimony that, given Plaintiff's residual functional capacity, he retained the ability to perform

9

his past work as a security manager as that occupation is generally performed in the national economy. R. 23.

**D. Documents Before the Appeals Council**

In July 2010, Plaintiff fell off a ladder and fractured his left foot. R. 523. One month later, in August 2010, Plaintiff returned to Dr. Vaughan who reported that Plaintiff began oxygen therapy and now has less discomfort in his chest and less dyspnea on exertion. R. 536. Plaintiff reported that he "rarely" experienced angina. R. 536. Dr. Vaughan noted that Plaintiff's nuclear stress test was consistent with his known occluded distal right coronary artery. R. 536. The testing also showed that Plaintiff had normal left ventricular wall motion and an ejection fraction of 67%. R. 536. An echocardiogram revealed "mild" aortic valve sclerosis with "mild" aortic insufficiency. R. 536. Dr. Vaughan continued to treat Plaintiff with medication management and directed him to return in three months. R. 537. (Pulmonary Function Test R. 509)

Plaintiff presented to his primary care physician, Ronald Bercasio, M.D., in September 2010 to have paperwork filled out for a portable oxygen tank that he needed for his plane ride to San Diego for a one week vacation. R. 514-15. On examination, Plaintiff had normal breath sounds without rales or wheezes. R. 516. Plaintiff's musculoskeletal and neurological examinations appeared normal. R. 516. Dr. Bercasio's notes state that Plaintiff responded well to Exalgo as it relieved 80-90% of Plaintiff's symptoms, especially in his back and arms. R. 518.

In October 2010, x-rays of Plaintiff's right hand, left hand, and left knee revealed only mild degenerative changes. R. 531-33. X-rays of Plaintiff's neck showed mild to moderate degenerative changes, R. 530, and x-rays of Plaintiff's lumbar spine showed mild lumbar degenerative changes but was otherwise unremarkable, R. 529.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2006); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N. Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. **ANALYSIS**

To qualify for a period of disability and DIB under the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the:

> inability to do any substantial gainful activity[5] by reason of any medically determinable physical or mental impairment[6] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a) (2011); see also 42 U.S.C. §§ 423(d)(1)(A) (2006). To meet this definition, the claimant must have a "severe impairment"[7] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful

---

[5] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties; and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R.§ 404.1572.

[6] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[7] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c).

activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

Plaintiff argues to this Court that the ALJ erred in each of the following ways:

**A. The ALJ erred by finding that Plaintiff was not credible**

Plaintiff claims that the ALJ erred in finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were not consistent with the residual functional capacity assessment. Pl.'s Mot. 12. He alleges that any assessment of credibility is bolstered by consistency, "both internally and with other information on the record." Id. (citing Batista v. Chater, 972 F. Supp. 211, 221 (S.D.N.Y. 1997)).

After step-three of the ALJ's five part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's residual functional capacity. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The residual functional capacity must incorporate impairments supported by the objective medical evidence and impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment

that could reasonably produce the claimant's pain or symptoms. Id. If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individual's ability to work. Id. at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. Id. at 595-96.

This Court is required to give great deference to the ALJ's credibility determinations. See e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Edelco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. Id.

Furthermore, as the Fourth Circuit recognizes, Plaintiff's subjective statements about his pain and symptoms are not, alone, conclusive evidence that a Plaintiff is disabled. 20 C.F.R § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996). Finally, Social Security Ruling 96-p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of *all* the evidence in the record, including, but no limited to: (1) medical and laboratory findings, (2) diagnoses and

medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' affect on the ability to work.

In this case, Plaintiff claims that, based on the record as a whole, the ALJ's credibility finding is not supported by substantial evidence. Pl.'s Mot. 14. However, Plaintiff relies primarily on his own testimony and complaints, which are not supported by the medical records, to make this argument. The ALJ called into question the credibility of Plaintiff's complaints because they were inconsistent with both the medical evidence on the record and Plaintiff's own statements regarding his daily activities. R. 22 ("[Claimant] has been treated conservatively without hospitalization or emergency room visits for any of his severe impairments since 2007. His symptoms have been managed with medications. He has not stopped smoking despite urging from his primary care physician.  Mr. Holloway testified that, despite the limitations, he is able to do light housework, prepare meals, do laundry, and drive a car.").

Further, the ALJ observed that no treating physician provided an opinion indicated that Plaintiff is disabled. R. 22. Plaintiff's treating cardiologist encouraged Plaintiff to begin regularly exercising, suggesting he had the physical capability to do so. R. 405.  Dr. Castle and Dr. Moreno determined Plaintiff could perform sedentary work activities, even after carefully evaluating Plaintiff's subjective complaints. R. 279, 397-98. These instances support the ALJ's finding that plaintiff's impairments and subjective complaints did not prevent him from performing sedentary work activities.

Additionally, the ALJ noted that Plaintiff responded well to medication and treatment.

R.22. For example, Dr. Bercasio noted Plaintiff's symptoms vastly improved with use of medication, particularly with respect to Plaintiff's complaints due to back pain (R. 518), angina, and pulmonary disorder. R. 528. Further, as late as September 2010, the Plaintiff indicated that his medication relieved 80-90% of his symptoms, particularly in the arms and back. R. 518.

Plaintiff's argument relies solely on his testimony before the ALJ, but, as explained above, the full record contains evidence contradicting this testimony. The ALJ did not ignore Plaintiff's testimony, recognizing that Plaintiff's ailments could "reasonably be expected to cause significant limitations in the claimaint's ability to lift, carry, sit, stand, or walk." R. 22. However, Plaintiff's subjective complaints of pain and limitation simply cannot take priority over objective medical evidence or lack thereof and, when taken as a whole, the Commissioner's decision is supported by substantial evidence. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

**B. The ALJ erred by imposing an improper hypothetical question to the Vocational Expert (Linda Augins) regarding Residual Functional Capacity**

Plaintiff claims that the hypothetical question posed to Ms. Augins at Plaintiff's 2009 disability hearing was erroneous, as it did not specifically address a sitting limitation. Pl.'s Mot. 11. Without explicitly asking about a sitting limitation, Plaintiff argues, Ms. Augins' testimony that Plaintiff would be able to perform work as a security manager is of questionable accuracy. Id.

At the hearing, the ALJ asked Ms. Augins:

> I'd like for you to assume a person of the same age, education and work background as Mr. Holloway. I'd like you to assume that individual could perform sedentary work, provided the work does not involve more than two hours of standing and walking in an eight hour work day, would not require more than occasional

16

>postural activities, and would not expose the individual to any excessive dusts, fumes, odors, or gasses. Would that profile support the work of a security manager and as that work is normally performed per the Dictionary of Occupational Titles?

R. 52. Ms. Augins answered in the affirmative. Id.

A vocational expert is used to assist the ALJ in determining if a claimant is able to perform his past relevant work, or if there is work available in the national economy for which the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). For a vocational expert's opinion to be useful and relevant, it must 1) be in response to "proper hypothetical questions which fairly set out all of claimant's impairments," and 2) be based on a consideration of all other evidence the record contains. Id. (internal citations omitted).

With respect to the first requirement, the ALJ asked Ms. Augins to assume that the individual could perform sedentary work, not requiring standing and walking for more than two hours in an eight hour workday. R. 52. The ALJ's hypothetical question directed Ms. Augins to therefore assume that the hypothetical individual could sit for at least six hours in an eight hour workday, requiring her to merely subtract two hours of standing and walking from the eight hour workday. Based on this simple math, the question posed by the ALJ does indeed enable Augins to fairly set out all of Plaintiff's impairments, including any time restriction Plaintiff may have with respect to sitting.

Regarding the second requirement, the question posed to the expert took into consideration the entire record. In fact, the portion of the hypothetical specifically attacked by Plaintiff reflects, nearly verbatim, information contained in the Physical Residual Functional Capacity Assessment completed by Dr. Castle. R. 273-79. That is, Dr. Castle indicated that

17

Plaintiff can "[s]tand and/or walk . . . for a total of at least 2 hours in an 8-hour workday" and "sit . . . for a total of about 6 hours in an 8-hour workday." R. 274.

The ALJ had sufficient grounds for affording little weight to Plaintiff's testimony regarding his limitations, as discussed supra. As such, the vocational expert's testimony was responsive to a hypothetical question which fairly described Plaintiff's limitations, as the ALJ found them to be credible, and based on a consideration of all evidence contained in the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The Court therefore finds that there is substantial evidence in the administrative record to support the ALJ's reliance on Ms. Augins' testimony as evidence of Plaintiff's residual functional capacity and ability to perform his past relevant work, and that the ALJ's formulation of the hypothetical question and decision to rely upon Ms. Augins' response were reached based upon a correct application of the relevant law.

## V. **RECOMMENDATION**

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be AFFIRMED.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with

a copy thereof.

      2. A district judge shall make a <u>de novo</u> determination of those portions of this Report or specified findings or recommendations to which objection is made.

      The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984), <u>cert. denied</u>, 474 U.S. 1019 (1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208 (1984).

                                                                                           /s/
                                                          Tommy E. Miller
                                       UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 15, 2011

## **CLERK'S MAILING CERTIFICATE**

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Kent P. Porter
United States Attorney's Office
101 W. Main St.
Suite 8000
Norfolk, VA 23510
757-441-6331
Email: kent.porter@usdoj.gov


Barbara Evans-Yosief
Evans-Yosief Law Firm, LLC
1517 Hardy Cash Drive
Hampton, VA 23666
757-827-3588
Email: b2evans-yosief.law@cox.net

                                      Fernando Galindo, Clerk


                              By _____

                                      Deputy Clerk
                                   December \_\_\_\_, 2011